IN RE ESTATE OF EDWARD P. MEYERS.
DOUGLAS COUNTY, APPELLANT, V. ESTATE OF EDWARD P. MEYERS ET AL., APPELLEES.
288 N. W. 35

FILED OCTOBER 27, 1939. No. 30688.

*James T. English* and *Oscar T. Doerr,* for appellant.

*Votava, McGroarty & Sklenicka* and *Marshall B. Reynolds, contra.*

Heard before SIMMONS, C. J., EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

MESSMORE, J.

Edward P. Meyers died August 25, 1938, in the city of Omaha, Douglas county, Nebraska. September 8, 1938, Margaret G. Meyers, his widow, filed a petition in the county court of Arthur county, praying for the probate of her husband's estate and that letters testamentary issue to her as executrix under the will; alleging also that the deceased left personal property in the state of Nebraska in an amount exceeding $100,000. September 29, 1938, Douglas county filed objections to the jurisdiction of the county court of Arthur county to probate the estate, alleging that the deceased was not a resident of that county at the time of his death, but was a resident of Douglas county. Arthur county was permitted to intervene, and, by petition, alleged that the deceased was a resident of Arthur county at the time of his death, and that the county court of Arthur county had exclusive and original jurisdiction of the probate of the estate, praying the objections of Douglas county be overruled. The county court overruled the objections of Douglas county, thus finding that the deceased was a resident of Arthur county, Nebraska, and that said court had jurisdiction to probate the estate. From this order

Douglas county appealed to the district court for Arthur county, which found that at the time of his death the deceased was a resident of Arthur county, affirmed all orders of the county court of Arthur county, and certified the judgment of the district court to the county court of Arthur county for further proceedings. The present appeal is from the order of the district court for Arthur county.

The only issue raised by the appeal is: Do the facts prove residence of the decedent in Arthur county or in Douglas county? Douglas county relies on the facts as shown by stipulation, concisely stated as follows:

Edward P. Meyers leased an apartment, No. 107 St. Regis, located at 621 South Thirty-seventh street in the city of Omaha, and lived at the apartment for a period of time during each year for at least eight successive years. His name was listed in the telephone directory in Omaha, and his name, together with that of his wife, Margaret G. Meyers, was listed in the Omaha city directory during that period of time. He maintained a bank account in the United States National Bank of Omaha, had a safe deposit box in and transacted his banking business with the bank during this period of time. Margaret G. Meyers owned the furnishings for seven rooms in their apartment at the St. Regis, upon which she paid taxes to Douglas county.

The record discloses that more than 50 years ago Edward P. Meyers, then 21 years of age, located in Arthur county on a homestead consisting of a section of land, upon which he had a home and necessary appurtenances. During his lifetime he attained considerable success as a cattle man, and through marked attention to his business became wealthy. He lived continuously and apparently without interruption in Arthur county for many years, but during the later years of his life, more especially during the period of his second marriage some 20 years ago, he occasionally took trips in foreign countries, in Florida, or other places. In 1919 he rented an apartment at the Blackstone Hotel in Omaha and spent some time in Omaha each year. About eight or nine years prior to his death he moved to the St.

Regis apartment which he leased from year to year. The younger daughter attended a private school in Omaha, Duchesne Convent, and was so attending at the time of her father's demise. During the school year Meyers spent most of his time in Omaha, except occasionally, in the spring and fall, he would go to Arthur county to attend to his business, especially during the shipping season, and, together with his family, he spent the summers at his ranch home.

The evidence reflects that the decedent voted continuously in the elections held in Arthur county over a period of 50 years or more, and, in fact, voted there in the election of 1938, about three weeks before his death, and on one occasion, when absent from Arthur county, voted on an absentee ballot, accompanied by an affidavit as provided for by law. He repeatedly declared Arthur county to be his home to his wife, family and friends during the whole period of time that he lived in Omaha. In his later years he suffered from chronic ailments, of the kidneys and a weakened heart. The record is not in dispute that it was necessary for him to obtain constant medical treatment, that he was under the care of Omaha physicians, and that he could not stand the rigorous winters in Arthur county. He did his banking business in Omaha. There were no banks in Arthur county. He filed personal tax returns and paid his personal taxes in Arthur county. Without question he was assessed for taxes in Arthur county from the organization of the county as such until at least the year 1938, as shown by the county assessor. A certified public accountant, employed by Meyers in 1919 to assist in looking after his business interests, prepared the personal tax schedules for him for a period of many years and included therein all of the taxable personal property that the decedent owned. The Arthur county home was always open during the life of Mr. Meyers, but was not equipped for the winter months. His wife testified that her husband spent practically 50 per cent. of his time in Arthur county and 50 per cent. in Douglas county, in addition to the time in the early spring and late fall which he spent in Arthur county until the late years of his life. He

owned no property of any kind in Omaha and paid no taxes in Douglas county.

"The term 'domicile' is difficult of accurate definition, and it has been stated that the concept cannot be successfully defined so as to embrace all its phases. Its meaning, in each instance, depends upon the connection in which it is used." 17 Am. Jur. 588, sec. 2.

As stated in *Thorndike v. City of Boston*, 42 Mass. 242: "No exact definition can be given of domicile; it depends upon no one fact or combination of circumstances, but from the whole taken together it must be determined in each particular case."

"It is universally held that in order to acquire a domicile by choice these essentials must concur: (1) Residence (bodily presence) in the new locality, and (2) an intention there to remain. In other words, there must be. a concurrence of the fact and the intent, the factum and animus. Act and intent must, therefore, concur, and the absence of either of these thwarts the change. In addition there must be an intention to abandon the old domicile. As some writers express it, there must be an animus non revertendi and an animus manendi. The purpose to remain in or at the domicile of choice must be for an indefinite period of time." 17 Am. Jur. 599, sec. 16. See *Berry v. Wilcox*, 44 Neb. 82, 62 N. W. 249; *Wood v. Roeder*, 45 Neb. 311, 63 N. W. 853; *State v. School District*, 55 Neb. 317, 75 N. W. 855; *Shaw v. Alexander*, 94 Neb. 774, 144 N. W. 907; *Mudge v. Mudge*, 111 Neb. 403, 196 N. W. 706; *Denny v. Sumner County*, 134 Tenn. 468, 184 S. W. 14. In the last named case are cited *Hayes v. Hayes*, 74 Ill. 312; *Jopp v. Wood*, 34 L. J. Ch. n. s. 212; *Moorhouse v. Lord*, 10 H. L. Cas. \*272. See, also, Jacobs, Law of Domicile, sec. 72; Wharton, Conflict of Laws, sec. 21; *Reed's Will*, 48 Or. 500, 87 Pac. 763.

We recognize that the intent of a person is not readily susceptible of analysis, and, therefore, in keeping with the great weight of authority, conclude that all of the surrounding circumstances and the conduct of the person must be taken into consideration to determine his domicile. It is

obvious from the record in the instant case that Mr. Meyers was not physically well. He was advised that he could not stand the severe winters in Arthur county and he was under the supervision and care of physicians in Omaha. The record is void that the same care and attention could have been given him in Arthur county. It is likewise clear that, when his younger daughter arrived at the age where it was necessary to educate her, the previous traveling and placing her in schools in different localities would result unfavorably to her from an educational standpoint. Therefore, living in Omaha, the metropolitan city of the state, not a great distance from his business activities, would be logical. In so doing, he did not burden the city of Omaha with educating his daughter, but placed her in a private school at his own expense. He returned to Arthur county in the late spring and fall to attend to his cattle business,—the business in which he had made a success in the county in which he had lived all his life. In the summer months and during school vacations the family returned to Arthur county to the ranch home and there lived until opening of the next school year. There is nothing in the record to show that after the completion of his daughter's education, or in the event that he recovered his health, he would have made Omaha his permanent residence. He transacted banking business in Omaha, but there were no banking facilities in Arthur county, and, by necessity, his financial contacts, in a business of the magnitude which he managed, must be such that he could obtain ready financial assistance when the occasion demanded. This is not unusual. Apparently, he lived quietly in his St. Regis apartment for the purposes as before stated. We believe that his every act discloses his intention not to create a domicile in Omaha.

Mr. Meyers voted in Arthur county, from the time he located there, in every election except when he was traveling in foreign countries, and, when absent, he voted an absentee ballot, supported by an affidavit, as provided by law, that he was a citizen and resident of Arthur county. He voted in person in Arthur county shortly before his death,

at the 1938 primary election.

In support of the theory that in Nebraska voting is conclusive as to the question of domicile, appellee cites *Mallard v. First Nat. Bank,* 40 Neb. 784, 59 N. W. 511. We are inclined to the belief that the statement in reference to voting being conclusive in establishing domicile, as made in the cited case, is *dictum.* The rule applicable in the instant case is reflected by the following:

"Of all the formal acts to be scrutinized in ascertaining a person's domicile, undoubtedly the act of registering and voting is the most important, and while not necessarily conclusive, it is usually most convincing and persuasive." *Matter of Curtiss,* 140 Misc. 185, 250 N. Y. Supp. 146. See annotation, 107 A. L. R. 453.

In the case of *Cooper's Adm'r v. Commonwealth,* 121 Va. 338, 93 S. E. 680, it was said (p. 349) : "In doubtful cases particular significance should be attached to the repeated exercise of the right to vote, because this right depends upon citizenship and domicile, and must be generally, if not universally, supported by the oath of the voter. Its unlawful exercise subjects him to prosecution both for illegal voting and for perjury if he swears falsely, and such act is a distinct, unequivocal and public assertion by the voter of his legal domicile."

The court in *Sanderson v. Ralston,* 20 La. Ann. 312, upon rehearing, reexamined all the evidence and determined that the voting might be viewed in connection with certain antecedent facts as corroborative evidence to show that a person never intended to abandon his domicile in the state, although it asserted that the voting would not be conclusive by itself. See annotation, 107 A. L. R. 454.

In view of the foregoing authorities, we conclude that the fact that Mr. Meyers continuously voted in Arthur county is a strong factor in assisting to determine the status of his domicile.

It is disclosed that the change of residence to Omaha was for the purpose of benefiting the health of Mr. Meyers, and, in addition thereto, of educating his younger daughter. In

17 Am. Jur. 608, sec. 30, it is said: "A change of residence for the purpose of benefiting one's health does not usually effect a change of domicile. Such a change is looked upon as temporary merely, even though the actual time spent in the new residence may be long."

In *Reed's Will, supra,* the supreme court of Oregon said: "It is not residence alone, but it is the intention of the person, expressed or implied from the facts in evidence, conjoined with residence, that determines domicile. Every person *sui juris* and capable of controlling his personal movements may change his domicile at pleasure, but a change of domicile involves intention as the dominant factor. * * * A change of domicile, therefore, involves a question of fact and intent. The fact is easily proved because it is shown by the mere transfer of the bodily presence from the old to the new place of abode, but the intent with which the change is made is to be determined from the character of the residence, its object and purpose, in connection with the other evidence in the case. Residence in a particular place is a fact obvious to the senses and cannot be easily mistaken, but its value in fixing domicile is unimportant unless accompanied with an intent of remaining permanently or definitely, or, as it is sometimes said, with no present intent of removing therefrom. Residence alone, however long continued, will not effect a change of domicile. On this point the authorities speak with practically one voice. * * * To lose a domicile when once acquired, there must be an intention to do so. A mere change of the place of abode, however long continued, is not sufficient, unless the proper animus or intention is present." It was said that the intention must concur with fact and must clearly appear.

To us it is apparent that Mr. Meyers' residence in Omaha was temporary and for the purposes as above set out, and, from all of the facts and circumstances from which we can discern his intention, he did not intend by such residence to create a domicile in Omaha, or to abandon his domicile as originally created in Arthur county. See *State v. School District, supra; Denny v. Sumner County, supra.*

Generally, oral or written declarations of a deceased person as to his domicile do not bear much weight in a consideration of the question. However, when all of the facts and circumstances of a given case are considered, occasions arise where declarations, both oral and written, as to an intention on the part of the person, become important and receive considerable weight from the courts; based, of course, upon the individual under consideration, his conduct, his business, the period of his living in one locality, and all other facts that may be deduced from any circumstance.

In the case of *Reed's Will, supra,* we find the following (p. 516) : "And Mr. Jacobs, in speaking of the weight to be given to the oral declarations of a party, says : 'The time, occasion and manner of making them, their reasonableness and consistency with themselves and with the other proved facts in the case, the presence or absence of the suspicion of sinister purpose in making them, the character and temper of the person, as well as (if they are oral) the length of time which has elapsed between the time of their alleged utterance and the time when they are testified to, etc., enter materially into the estimation of their value. If they are not inconsistent with the acts, and are faithfully reported, they often serve to turn the scale; but it is otherwise, if they are contradicted by the acts and general conduct of the person making them.' "

Nine years before his death, Mr. Meyers declared in his last will and testament that he was a resident of Arthur county, Nebraska. The making of a will naturally is a solemn occasion and especially so when a man is in poor physical condition and has reached old age. He contemplates the objects of his bounty with seriousness. Under the circumstances, the making of his will and the declarations, oral and written, as to his residence and domicile, made by him over a period of years are of such importance that such declarations and written instruments may be received, together with all the other evidence in the case, in assisting to determine the domicile of the decedent.

Having determined this case solely upon its merits, other alleged errors of the appellant need not be considered.

We conclude that the judgment and finding of the district court were right.

AFFIRMED.